IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| FREDERICK HOPKINS INDIVIDUALLY AND AS A REPRESENTATIVE OF THE ESTATE OF JUESTENE NEAL, <br><br> Plaintiffs, <br><br> v. <br><br> J. ORI, LLC D/B/A THE SPRINGS, <br><br> Defendant. | § § § § § § § § § § § § CIVIL ACTION NO. 2:21-CV-00065 |

**DEFENDANT J. ORI, LLC D/B/A THE SPRINGS' NOTICE OF REMOVAL**

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

Defendant J. Ori, LLC d/b/a The Springs ("The Springs") hereby removes the above-styled action to this Court from the 76/276th Judicial District Court of Morris County, Texas by filing this Notice and by filing a copy of this Notice in the 76/276th Judicial District Court of Morris County, Texas, pursuant to 28 U.S.C. §§ 1441 and 1446, reserving all defenses and objections to venue. The grounds for removal are based on 28 U.S.C. § 1331, 42 U.S.C. § 247d-6d(e)(1), and 28 U.S.C. § 1442(a)(1).

In support hereof, Defendant states as follows:

1.      This case is removable under 28 U.S.C. § 1441(a) on the basis of "original jurisdiction" because Plaintiffs' Petition asserts claims "arising under" and governed by federal law within the meaning of 28 U.S.C. § 1331.

2.      Plaintiff Frederick Hopkins Individually and as a Representative of the Estate of Juestene Neal, commenced this action on December 18, 2020 by filing Plaintiffs' Original Petition and First Request for Written Discovery in the 76/276th Judicial District Court of Morris County,

Texas, styled *Frederick Hopkins Individually and as a Representative of the Estate of Juestene Neal v. J. Ori, LLC d/b/a The Springs;* Cause No. 27012 ("State Court Action").  A copy of the certified docket sheet and all other process, pleadings, and orders served on Defendant and on file in the State Court Action are attached hereto as **Exhibits A and B**, as required by 28 U.S.C. § 1446(a).  (Specifically, the Plaintiffs' Original Petition and First Request for Written Discovery is attached as **Exhibit B**).

3. Defendant was served with process on January 26, 2021, as indicated in the service of process documents included in Exhibit A.

4. This is a proceeding in which Plaintiffs allege negligence against Defendant, arising from and concerning the alleged failure to follow specialized COVID-19 precautions and protocols, which led to Juestene Neal contracting COVID-19 while she was a resident of The Springs and subsequently passing away as a result.  Exhibit B, ¶¶ 13, 14, 18.

5. This Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b)(2)(B) in that Defendant is removing within thirty (30) days of receipt of the "initial pleading setting forth the claim for relief upon which such action or proceeding is based . . ."

6. Venue lies in this Court, i.e., the United States District Court for the Eastern District of Texas, Marshall Division, pursuant to 28 U.S.C. § 1441(a), because the original action was filed in state court in the 76/276th Judicial District Court of Morris County, Texas, located within the Eastern District of Texas, Marshall Division.  Venue, therefore, is proper in this Court because it is in the "district and division embracing the place where such action is pending." *Id.*

7. Pursuant to 28 U.S.C. § 1446(d), Defendant will promptly serve a copy of this Notice of Removal upon counsel for the Plaintiffs and will promptly file a copy of the same with the District Clerk of the 76/276th Judicial District Court of Morris County, Texas.

8. By filing this Notice of Removal, Defendant does not waive any defenses which may be available to it.

## JURISDICTIONAL FACTS, ARGUMENT AND AUTHORITY DEMONSTRATING REMOVAL IS PROPER

**A. This Court has original jurisdiction under 28 U.S.C. § 1331 (Federal Question) because Plaintiffs' claims arise under the Federal Public Readiness and Emergency Preparedness Act.**

9. This case is removable under 28 U.S.C. § 1441(a) on the basis of "original jurisdiction" because Plaintiffs' Petition asserts claims "arising under" and governed by federal law within the meaning of 28 U.S.C. § 1331.

10. Plaintiffs have alleged claims for which this Court has original jurisdiction pursuant to 28 U.S.C. §1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Federal courts have "jurisdiction to hear, originally or by removal from a state court, only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action *or* that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif.*, 463 US 1, 27-28 (1983); *Dennis v. Hart* 724 F.3d 1249, 1253 (9th Cir. 2013); *Rivet v. Regions Bank of Louisiana*, 522 US 470, 475 (1998).

11. "[A] state claim may be removed to federal court in only two circumstances—when Congress expressly so provides . . . or when a federal statute wholly displaces the state-law cause of action through complete pre-emption. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. In the two categories of cases where [the United States Supreme] Court has found complete pre-emption, the federal statutes at issue

provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action." *Beneficial National Bank v. Anderson*, 539 U.S. 1, 8 (2003).

12. While a plaintiff is ordinarily entitled to choose a state or federal forum and may evade federal jurisdiction by pleading only state law claims, express or complete preemption is an exception to the well-pleaded complaint rule. Complete preemption exists when the preemptive force of federal law is so powerful that it displaces any state law cause of action, and leaves room only for a federal claim for purposes of the "well-pleaded complaint" rule. *Metropolitan Life Ins. Co. v. Taylor* (1987) 481 US 58, 63-64. *See also NASDAQ OMX Group, Inc. v. UBS Securities*, LLC, 770 F.3d 1010 (2d Cir. 2014).[1] Complete preemption exists when (1) the statute relied upon by defendant as preemptive contains civil enforcement provisions within the scope of which plaintiff's state law claims fall; and (2) there is a "clear indication of Congressional intention to permit removal despite the plaintiff's exclusive reliance on state law." *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R. Co*. 858 F2d 936, 942 (3rd Cir. 1988) citing *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif., supra,* 463 U.S. 1, 24.

13. The issue of whether federal question jurisdiction exists when a Petition asserts a cause of action under state law is addressed in *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003). There, the Court explained:

> [A] state claim may be removed to federal court … when a federal statute wholly displaces the state-law cause of action through complete preemption. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. In the two categories of cases

---

[1] Federal jurisdiction requires that only one claim be identified as a federal question. *See* 28 USC § 1367 [supplemental jurisdiction]; *See also Franchise Tax Board v. Laborers Vacation Trust*, 463 US 1, 13 (1983).

> where this Court has found complete pre-emption … the federal statutes at issue provided the exclusive cause of action for the claim asserted and also set forth procedures and remedies governing that cause of action.

*Id*. at 8 (emphasis added; internal citations and footnotes omitted).

14. In *Anderson*, the plaintiff brought an action for usury under state law, which was preempted by the usury provisions of the National Bank Act (12 U.S.C.A. §§ 85 and 86). The Court held that the usury provisions under §§ 85 and 86 collectively "supersede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive." *Anderson*, 539 U.S. at 11. Therefore, the court held that federal question removal was proper under the "complete preemption" doctrine. *See also Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987) (holding that purely state law claims may be removed to federal court when a federal statute clearly intends for the action to be resolved under federal law).

15. Following *Anderson*, U.S. Circuit Courts and District Courts have subsequently found "complete preemption" where a federal statute expressly preempts state law and creates an exclusive federal remedy for preempted state claims, like here. *See, e.g., Spear Marketing, Inc. v. Bancorp South Bank*, 791 F.3d 586 (5th Cir. 2015); *In re WTC Disaster Site*, 414 F.3d 352, 380 (2d Cir. 2005); *Keller v. Bank of America, N.A.*, 228 F. Supp. 2d 1247 (D. Kan. 2017); *Nott v. Aetna U.S. Healthcare, Inc.*, 303 F.Supp.2d 565 (E.D. Pa. 2004).

16. The Public Readiness and Emergency Preparedness Act (PREP Act) is invoked when the Secretary of the Department of Health and Human Services ("HHS") issues a declaration determining—for purposes of the PREP Act—that a disease or other health condition constitutes a public health emergency. 42 U.S.C. § 247d-6d(b). If the Secretary determines that such conditions exist, he or she "may make a declaration, through publication in the Federal Register, recommending ... the manufacture, testing, development, distribution, administration, or use of one

or more covered countermeasures, and stating that [42 U.S.C. § 247d-6d(a)] is in effect with respect to the activities so recommended." *Id.*

17. Through the PREP Act, Congress provided an exclusive remedy for the substance of the allegations and relief sought in the Petition, and this federal law expressly pre-empts state law for purposes of federal question jurisdiction. *See* PREP Act, 42 U.S.C. § 247d-6d. It does so by providing the sole remedy for claims against covered persons for claims of injury or loss, which relate to the administration or use of a covered countermeasure, through a separate patient injury fund to be administered by the U.S. Department of Health and Human Services. *Id.*

18. Once the Secretary has issued a declaration, the PREP Act provides sweeping immunity for certain claims against certain covered individuals: "a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure...." 42 U.S.C. § 247d-6d(a)(1). This immunity "applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure." *Id.* at § 247d-6d(a)(2)(B) (emphasis added).

19. A "covered countermeasure" under the PREP Act is, simplified, a drug, biological product, or device that is a "qualified pandemic or epidemic product" or a "security countermeasure," or is authorized for emergency use under the Federal Food, Drug, and Cosmetic Act. *Id.* at § 247d-6d(i)(1).

20. Exceptions to immunity exist for claims of willful misconduct but suit must be brought in the United States District Court for the District of Columbia. 42 U.S.C. § 247d-6d(d)(1), (e)(1). For injuries not involving willful misconduct, the PREP Act establishes a "Covered Countermeasure Process Fund," which provides "compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure pursuant to such declaration." 42 U.S.C. § 247d-6e(a).

21. The Secretary has issued such a declaration regarding the COVID-19 pandemic. *See* 85 Fed. Reg. 15,198 (Mar. 10, 2020). The COVID-19 Declaration also defines covered countermeasures as "any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19 . . . or any device used in the administration of any such product, and all components and constituent materials of any such product." *Id*. at 15,202.

22. On December 9, 2020, United States Health and Human Services ("HHS") Secretary Alex Azar published in the Federal Register his Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID–19 and Republication of the Declaration (hereinafter "The Fourth Amendment"). (A true and correct copy of this Fourth Amendment is attached hereto as **Exhibit C**). The Amendment was "effective as of February 4, 2020."

23. The Fourth Amendment addressed the following key issues: (1) whether this Court has jurisdiction over this case in which Defendant claims immunity under the PREP Act; and (2) whether there is immunity under the PREP Act for claims involving alleged omissions or failures to administer a Covered Countermeasure. The Fourth Amendment is a direct response to recent

remand decisions by the United States District Courts, and was issued to clarify and confirm the scope of PREP Act immunity and exclusive federal jurisdiction. In short, the Fourth Amendment:

(1) ***Makes explicit that COVID-19 cases involving interpretation of the PREP Act and/or Covered Countermeasures are to be in the federal court system or in the administrative alternative remedy Congress provided, and that federal jurisdiction over all matters involving interpretation of the PREP Act is essential to the uniform, national response to the COVID-19 pandemic*** (Exhibit C, p. 18-20);

(2) Incorporates all COVID-19 Advisory Opinions as part of the Declaration (Exhibit C, p. 10);

(3) Expands the liability protections under the PREP Act to include all activities relating to Covered Countermeasures for COVID-19 (Exhibit C, p. 14-15); and

(4) ***Makes clear that an omission or failure to administer a Covered Countermeasure can fall within the PREP Act's protections*** (Exhibit C, p. 17).

24. The Fourth Amendment makes clear that cases involving Covered Countermeasures (even those involving allegations of omissions or failure to employ such counter-measures) and/or the interpretation of the PREP Act are to be adjudicated in Federal Court.

25. Further, on January 8, 2021, the Office of the General Counsel (OGC) affirmed that the PREP Act is a complete preemption statute and clarified the scope of the Act relative to the ongoing pandemic. *See* OGC Advisory Opinion 21-01, attached hereto as **Exhibit D**, at 2-3. It noted that a limited view of the use or non-use of a covered countermeasure "clashes with the plain language of the PREP Act, which extends immunity to anything 'relating to' the administration of a covered countermeasure." *Id*. at 3. "Decision-making that leads to the non-use of covered

countermeasures by certain individuals is in the grist of program planning, and is expressly covered by PREP Act." *Id*. at 4. The OGC noted the only instance where preemption would not attach is if a defendant failed to make any decisions whatsoever, thereby abandoning its duty to act as a program planner, i.e., total inaction. *Id*. at 4. Such does not apply to The Springs.

26. The District Court of the Central District of California recently held that a case alleging failure to adhere to Covid-19 infection control protocols was preempted by the PREP Act. *Garcia et al v. Welltower OpCo Group LLC et al*, SACV 20-02250JVS(KESx), 2021 WL 492581, *5, 7 (C.D.Cal. 2021). The *Garcia* Court noted unsuccessful attempts at compliance with federal or state guidelines are covered by the PREP Act, the Declaration, and the January 8, 2021 Advisory Opinion. *Id*. at *9. Such are not instances of nonfeasance, but are instances where the covered person acted in ways to "limit the harm such pandemic or epidemic might otherwise cause, and thus relate to the use of a covered countermeasure." *Id*.

27. Plaintiff filed this action individually and as a representative of the Estate of Juestene Neal. Exhibit B. Plaintiffs' Petition alleges that due to the wrongful acts and omissions of Defendant, decedent Juestene Neal became infected with COVID-19 during her residency at The Springs and died due to the virus. *See* Exhibit B, ¶¶ 13, 14, 18. Plaintiff specifically alleges Defendant "failed to properly monitor and care for Juestene Neal, which ultimately led to her injuries, which included the contraction of COVID-19." *Id*. at ¶ 13. Unsuccessful attempts at compliance with federal or state guidelines are covered by the PREP Act, the Declaration, and the January 8, 2021 Advisory Opinion. *Garcia*, 2021 WL 492581 at *9.

28. Defendant The Springs is a "covered person" in that the subject facility is a residential healthcare facility licensed by the State of Texas. Defendant The Springs is also a

"covered person"[2] because it meets the requirements of a "program planner" of countermeasures under the PREP Act, in that it administers, supervises or houses a program that administers, provides or dispenses covered countermeasures,[3] and/or Defendant The Springs is a "qualified person" who is authorized to prescribe, administer or dispense countermeasures, as defined under the PREP Act. Further, there is a causal nexus between the use of a covered countermeasure by the covered person to the alleged injuries.

29.     As Congress has clearly manifested the intent to preempt state law with respect to claims that invoke or involve PREP Act immunity and to create an exclusive federal remedy for such preempted claims, thereby "completely preempting" state law for purposes of federal question jurisdiction, Plaintiff's Petition invokes or involves a federal question for which the governing federal law "completely preempts" Plaintiff's state law claims, and removal is proper under 28 U.S.C. § 1441(a).

**B.    This Court has original jurisdiction under 28 U.S.C. § 1442(a)(1) (Federal Question) because Plaintiffs' claims arise under the Federal Office Statute.**

30.     Removal is also proper under 28 U.S.C. §1442(a)(1), which provides for removal when a Defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under §1442(a)(1), when the removing defendant establishes that:

(a)    Defendant is a "person";
(b)    Defendant was acting under the direction of a federal officer when it engaged in the allegedly tortious conduct;

---

[2] Nothing in the PREP Act suggests that the countermeasures that relate to an injury must be administered or used by the "covered person" who is the defendant in the case. In fact, in the text of the PREP Act, the countermeasures which relate to the claimed injury must only be administered or used by "an individual." Further, nothing in the PREP Act suggests that the identified countermeasures must be the efficient cause of the claimed injury. Again, to the contrary, the example used in the HHS Secretary's PREP Act Declaration, which notes that the PREP Act provides liability immunity to a countermeasure distributor for a slip and fall caused by, for example, lax security, demonstrates that the countermeasure merely must play some causal role in connection with the claimed injury.

[3] Further, it supervised and administered the facility's infection control policy program, under which FDA approved personal protective equipment, and other countermeasures, including, but not limited to, COVID-19 testing throughout the facility, which were used and administered in an effort to diagnose, mitigate, treat, and prevent COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom.

  (c)  There is causal nexus between the Plaintiff's claims and the Defendant's actions under federal direction; and

  (d)  Defendant has raised a colorable defense based upon federal law.

*Goncalves v. Rady Children's Hospital San Diego* 865 F.3d 1237, 1244 (9th Cir. 2017). Courts have a duty to broadly interpret § 1442 in favor of removal, which "should not be frustrated by a narrow, grudging interpretation" of the statute. *Id*. at pg. 1244 [quotations and citations omitted.]

  31. This statute creates removal jurisdiction even as to cases that otherwise could not be commenced in or removed to federal court (e.g., common law negligence action against government driver who lives in same state as plaintiff; hence no diversity). *Jefferson County, Ala. v. Acker* (1999) 527 US 423, 431; *Mir v. Fosburg* (9th Cir. 1980) 646 F.2d 342, 344. Moreover, unlike the usual rule that removability in federal question cases must appear on the face of a well-pleaded complaint, cases may be removable under §1442(a) when a federal officer or agency raises a "colorable federal defense." *See Jefferson County, Ala. v. Acker*, *supra*, 527 US at 431.

  32. The Fourth Amendment supports removal under the federal officer statute and provides that "COVID-19 is an unprecedented global challenge that requires a whole-of-nation response that utilizes federal-, state-, and local- distribution channels" as well as private distribution channels. In the Fourth Amendment, the Secretary makes explicit that "there are substantial legal and policy issues and interests in having a unified, whole-of-nation response to the COVID-19 pandemic, among federal, state, local and private-sector entities." The Secretary's pronouncement in the Fourth Amendment to his Declaration under the PREP Act demonstrates that the federal directives with respect to the pandemic response being followed by The Springs were not merely general regulations and public directives regarding the provision of medical

services, but were part of the whole-of-nation response to the pandemic coordinated at the national level.

33.   Here, The Springs satisfies all elements for removal under §1442(a)(1).  The Springs is a "person" for the purpose of the federal officer.  The term "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; *see also Goncalves*, 865 F.3d at 1244.  The Springs was also acting under the direction of a federal office when it engaged in the alleged tortious conduct.  The United States Supreme Court has held that the phrase "acting under" involves "an effort to *assist*, or help *carry out*, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos.*, 551 US 142, 152 (2007); see also *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Association of Philadelphia*, 790 F.3d 457 (3rd. Cir. 2015).  The "acting under" requirement is broad and is to be liberally construed.  *Watson*, 551 US at pg. 147.

34.   The "acting under" requirement is met when Defendant is acting pursuant to detailed and ongoing instructions from a federal officer.  *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387 (5th Cir. 1998).  The Springs meets the "acting under" prong for removal based on the federal officer statute.  Here, Plaintiff contends that the acts and omissions of The Springs with respect to its response to the COVID-19 pandemic caused decedent, Juestene Neal, to contract the virus and led to her death therefrom.  Exhibit B, ¶ 13, 14, 18.

35.    On March 30, 2020, the State of Texas sent a team from the Special Infection Control  Assessments ("SICA") Division of the Texas Health and Human Services Commission ("HHSC") to The Springs  to conduct a COVID-19 Focused Infection Control Survey.  The

members of the SICA team who performed the assessment included Vanessa Mahfood, Karah Humphries and Dedra Woodard.[4]

36.     The SICA team assessed, among other things, The Spring's (1) supplies; (2) COVID-19 policies; (3) personal protective equipment ("PPE"); (4) sanitization practices and plan; and (5) isolation practices.  Based on the SICA team's assessment, it created a comprehensive COVID-19 plan for The Springs based on CDC guidelines.  The plan included, among other things, (1) additional instruction and education on PPE supplies, usage, and practices; (2) additional sanitization procedures; and (3) isolation procedures.  For the isolation procedures, the SICA team recommended the use of cold, warm, and hot zones to isolate negative or presumed negative COVID-19 residents (cold zone); residents potentially exposed to COVID-19 (warm zone); and COVID-19 positive or presumed positive patients (hot zone).  The zones were geographically separated and had physical barriers and PPE stations in-between each zone.  *Id.* at ¶¶ 4-5.

37.     On May 18, 2020, the HHSC performed a Quality Monitoring Program assessment and made recommendations for improvements in COVID-19 infection control pursuant to CDC guidance.  On July 8, 2020, HHSC performed an additional assessment of The Springs.  The Assessors were John Erhard, Aisha Marques, Vanessa Mahfood and Ruben Atencio.  Further recommendations were made related to COVID-19 infection control.  The Springs followed these recommendations.  *Id.* at ¶¶ 6-7.

38.     The morning of July 11, 2020, a resident of The Springs with chronic respiratory failure and COPD was transferred to Good Shepherd Medical Center due to low oxygen saturation and shortness of breath.  That evening, the hospital informed the facility that this resident had

---

[4] *See* Declaration of Heather Smith, attached hereto as **Exhibit E**, ¶ 3.

tested positive for COVID-19.  The Springs Administrator immediately informed the State and requested assistance.  *Id*. at ¶ 8.  On or about July 14 or 15, 2020, at the request of The Springs, HHSC performed an inspection of the facility's COVID-19 infection control systems.  No deficiencies were found.  *Id*. at ¶ 9.

39. On July 20, 2020, HHSC performed COVID-19 testing on all residents and staff.  Juestene Neal was tested.  She had not exhibited symptoms of COVID-19 infection.  On July 22, 2020, the results of the COVID-19 testing were received by The Springs.  Ms. Neal's test result was positive.  On July 23, 2020, her physician, Dr. Kish Carlton, began treating her using a COVID-19 protocol.  On information and belief, this was a protocol recommended by the CDC.  Ms. Neal remained asymptomatic.  On July 30, 2020, Ms. Neal developed a cough and elevated temperature and stated that she did not feel well.  The Springs sent her to Good Shepherd Medical Center via EMS that day.  Ms. Neal did not return to the facility.  A family member informed The Springs that she transferred from Good Shepherd Medical Center to a Long Term Acute Care facility.  On August 16, 2020, The Springs was informed by a family member that Ms. Neal had passed away.  *Id*. at ¶¶ 10-15.

40. Prior to the current national pandemic, regulation of nursing homes was very general in nature.  In 1987, Congress enacted legislation, known as the Nursing Home Reform Act, requiring nursing homes participating in Medicare and Medicaid to comply with certain quality of care rules and regulations.  *See* 42 U.S.C. § 1396r, 42 U.S.C. §1395i-3 and 42 C.F.R. § 483.1 through 42 C.F.R. §483.95.  The Centers for Medicare and Medicaid Services contract with state surveyors, to perform federal surveys to ensure that facilities accepting Medicare and Medicaid payments comply with federal laws and regulatory requirements.  Generally, and prior to the

pandemic, these surveyors conducted site visits to evaluate whether facilities are in compliance with federal requirements and regulations. *See* 42 U.S.C. § 1395aa; and 42 CFR §488.10.

41. In January and February, 2020, the CDC issued a number of health updates regarding the 2019 Coronavirus, as well as criteria to guide the evaluation and testing of patients under investigation ("PUI") for COVID-19. Healthcare providers were advised to identify PUI based on clinical features (i.e., fever or signs/symptoms of lower respiratory illness), travel to an affected geographic region and contact with a laboratory confirmed COVID-19 patient. Persons meeting the PUI criteria were to be tested and healthcare providers were advised to immediately notify their local or state health department in the event they were evaluating a PUI. State health departments in turn were instructed to immediately contact the CDC and complete a PUI case investigation form.

42. On March 4, 2020, CMS issued a Memorandum to State Survey Agency Directors regarding Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in nursing homes. The State Survey Agency, as agent for CMS, was also responsible for disseminating the contents of the memo to the States' nursing homes. The memo instructed facilities to screen visitors for international travel, symptoms of respiratory infection, and contact with someone with or under investigation for COVID-19, and to restrict entry of visitors who meet these criteria. Facilities were advised to screen staff for the criteria as well, and that staff who meet the criteria should not report to work. The CMS guidance also included directions as to when to transfer a resident with a suspected or confirmed COVID-19 infection to a hospital, and under what conditions a nursing home may accept patients diagnosed with COVID-19. CMS advised facilities to follow the available CDC guidance regarding infection prevention and control.

43. On March 21, 2020, the CDC issued further guidance specifically aimed at long term care facilities entitled "Preparing for COVID-19: Long-term Care Facilities Nursing Homes." In this publication, nursing homes were advised to restrict visitation, restrict all volunteers and non-essential healthcare personnel, cancel group activities and communal dining, implement active screening of residents and healthcare providers for fever and respiratory symptoms, and make PPE available in areas where resident care is provided and place a trash can near the exit inside the resident's room so staff can discard PPE prior to exiting.

44. Also on April 2, 2020, CMS issued new guidelines aimed at long-term care facilities to mitigate the spread of COVID-19. CMS noted that the CDC and CMS were providing "critical, needed leadership for the Nation's long-term care facilities to prevent further spread of COVID-19" and that long term care facilities were to immediately implement symptom screening for all persons (residents, staff, visitors, outside healthcare workers, vendors, etc.) entering a long term care facilities. Facilities were ordered to specifically ask about COVID-19 symptoms and to check the temperature of all visitors, as well as limit access points and ensure that all accessible entrances have a screening station. Every resident was also to be assessed for symptoms and have their temperature checked every day, and patients and residents entering facilities screened for COVID-19 through testing, if available. CMS ordered facilities to ensure all staff are using appropriate PPE when interacting with residents to the extent PPE is available and per CDC guidance on the conservation of PPE. CMS further directed long term care facility staff to wear a facemask while in the facility for the duration of the state of emergency, to wear full PPE for the care of any resident with known or suspected COVID-19, and if COVID-19 transmission occurs in the facility, healthcare personnel were to wear full PPE in the care of all residents irrespective of COVID-19 diagnosis and symptoms. Further, to avoid transmission within long-term care

facilities, the facilities were advised to use separate staffing teams for COVID-19 positive residents to the best of their ability, and to work with State and local leaders to designate separate facilities or units within a facility to separate COVID-19 negative residents from COVID-19 positive residents and individuals with unknown COVID-19 status.

45. At all relevant times The Springs was acting at the specific direction of federal authorities including the HHSC to address the on-going federal effort and national state of emergency to contain the COVID-19 pandemic, and prevent the spread of the virus.  All actions taken by The Springs in preparation for and response to the COVID-19 pandemic, were taken "in an effort to assist, or help carry out, the duties or tasks" as ordered by the CDC and CMS (including the Texas Health and Human Services Commission), and performed pursuant to the direct orders and comprehensive and detailed directives issued by these agencies.  The Springs was acting at the direction of the federal government to prevent, treat and contain COVID-19 at the facility and in its care and treatment of Juestene Neal.

46. Next, to establish removal under the federal officer statute, Defendant must show "a causal nexus between the plaintiff's claims and the defendant's actions under federal direction." *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998).

47. Here, Plaintiffs allege that due to the wrongful acts and omissions of Defendant, The Springs, decedent Juestene Neal became infected with COVID-19 during her residency at The Springs and died due to the virus.  Exhibit B, ¶¶ 13-14.  The Springs' response to the COVID-19 pandemic as it relates to the claims of Plaintiffs (i.e., the care and treatment of Juestene Neal) was directly related to the orders and directives issued by the federal government.  There is a clear causal nexus between the claims against The Springs and the actions taken by The Springs at the direction of the federal government including, but not limited to, the direction of CDC, CMS, and

the HHSC, with respect to the response to the pandemic at the facility and the administration of care to Juestene Neal. The nexus element is met as The Springs was following the orders/directives of CMS with regard to infection control, COVID-19 testing and the use of PPE.

48. Lastly, Defendant meets the final requirement as it intends to assert colorable federal defenses. For purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statue is to secure the validity of the defense to be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). The colorable federal defense element is met where a defendant alleges its actions were justified as the defendant was complying with federal directives with respect to the alleged wrongful acts. *See Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994); and *Mesa v. California*, 489 U.S. 121, 126-127. *See also Rural Community Workers Alliance v. Smithfield*, 459 F.Supp.3d 1228 (W.D. Missouri, 2020) finding that compliance with federal guidelines aimed to protect employees from COVID-19 exposure served as a defense to civil liability.) Here, Defendant The Springs was complying with Federal directives and regulations issued by CMS and the CDC in responding to all aspects of the COVID-19 pandemic.

49. The colorable federal defense element is also met as Defendant asserts an immunity defense under the Public Readiness and Emergency Preparedness Act ("PREP Act") as set forth at 42 U.S.C. 247d-6d(a)(1).

C. **This Court has original jurisdiction because Plaintiffs' claims raise substantial and important federal issues thus providing embedded federal question jurisdiction.**

50. Federal jurisdiction is appropriate as this state action "arises under" federal law and raises a substantial federal issue. *See Grable & Sons Metal Products v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005). The applicability of the PREP Act poses a substantial federal issue which would serve to clarify and determine vital issues of federal law. Federal

question jurisdiction over state law claims may be sustained if the claims present a substantial, imbedded question of federal law. *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 US 804, 808 (1986). In *Grable & Sons Metal Products v. Darue Engineering & Mfg*, 545 U.S. 308 (2005), the United States Supreme Court held that removal is appropriate if (1) the state law claim necessarily raises a disputed and substantial issue; and (2) a federal court may entertain the claims without disturbing federal/state comity principles. *Id*. at 314.

51. In the Fourth Amendment to his Declaration under the PREP Act, Secretary Azar makes explicit that the PREP Act presents substantial federal legal and policy issues, and that there are substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products v. Darue Engineering & Manufacturing*, in having a unified whole-of-nation response to the COVID-19 pandemic among federal, state, local and private-sector entities.

52. This case also satisfies the second prong set forth in *Grable*. Federal jurisdiction over Plaintiffs' claims will not disturb federal-state comity principles under the *Grable*. As set forth by Secretary Azar in the Fourth Amendment to his Declaration: "Through the PREP Act, Congress delegated to me the authority to strike the appropriate Federal-state balance with respect to particular Covered Countermeasures through PREP Act declaration." Moreover, the plain, statutory language of the PREP Act expresses a strong federal interest and a clear intention to supersede or preempt state control of the issues raised by Plaintiff's Complaint.

## PRAYER

**WHEREFORE**, Defendant J. Ori, LLC d/b/a The Springs asks this Court to remove the action referred to as *Frederick Hopkins Individually and as a Representative of the Estate of Juestene Neal v. J. Ori, LLC d/b/a The Springs;* Cause No. 27012 and filed in the 76/276th Judicial District Court of Morris County, Texas, to this Court.

Respectfully submitted,

*/s/ Darrell L. Barger*
DARRELL L. BARGER
State Bar No. 01733800
dbarger@hartlinebarger.com
CYNTHIA CRAWFORD
State Bar No. 05019550
ccrawford@hartlinebarger.com

HARTLINE BARGER LLP
1980 Post Oak Blvd, Suite 1800
Houston, Texas 77056
(713) 759-1990
(713) 652-2419 – facsimile

And

MICHAEL G. TERRY
State Bar No. 19799800
mterry@hartlinebarger.com

HARTLINE BARGER LLP
800 N. Shoreline, Suite 2000 – North Tower
Corpus Christi, Texas 78401
(361) 866-8000 – Telephone
(361) 866-8039 – Facsimile

**ATTORNEYS FOR DEFENDANT
J. ORI, LLC D/B/A THE SPRINGS**

## CERTIFICATE OF SERVICE

On February 25, 2021, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Darrell L. Barger*